**Jo Ann MORROW, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–510.**

Court of Appeals of Alaska.

Aug. 9, 1985.

---

Carl E. Forsberg, Birch, Horton, Bittner, Pestinger and Anderson, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

On December 1, 1983, the mother of a sixteen-year-old juvenile, M.W., contacted Alaska State Trooper Geoffrey Engleman. M.W.'s mother informed Trooper Engleman that she believed her daughter was dealing drugs. Later that day, Trooper Engleman and another officer met with M.W.'s mother at her residence. There, she informed them that she had discovered plastic bags containing pills in M.W.'s purse. An officer then searched M.W.'s purse and discovered six plastic bags containing different colored pills.

Subsequently, Trooper Engleman interviewed M.W. At that time, M.W. informed the trooper that seven to nine days previously, Jo Ann Morrow had supplied her with 300 pills. She had obtained them from Morrow while in Morrow's car. At that time, Morrow told M.W. the pills were "speed" and instructed M.W. to sell each pill for $1.00. Morrow told M.W. she would receive ⅓ of the money from the sales and if M.W. ran out of pills, Morrow could supply more. M.W. also stated that she had sold some of the pills and had given Morrow $39 and Morrow had returned $12 or $14 to M.W. on November 30, 1983, as commission on the sales.

Trooper Engleman had the pills field-tested and determined that they were not "speed." However, because of their appearance, they could pass for "speed" on the street. Subsequent laboratory tests disclosed that the pills contained caffeine and ephedrine.

Based on the information provided by M.W., and his own familiarity with "fake controlled substances," Trooper Engleman obtained a search warrant for Morrow's residence. The warrant authorized a search of the residence for: drugs which appeared to be amphetamine based; written records of the ordering of such drugs; and magazines or books from which such drugs could be ordered. A search of the residence on December 1, 1983, resulted in the seizure of: approximately 5,000 tablets and capsules, similar to those obtained from M.W.; brochures advertising diet pills and stimulants; various items of drug paraphernalia; and from Morrow's purse, a list of names and telephone numbers, including M.W.'s.

On December 6, 1983, a grand jury returned a two-count indictment charging Morrow with delivery of an imitation controlled substance to a minor and possession of an imitation controlled substance with intent to deliver. AS 11.73.030(a); AS 11.-73.010(a). On March 10, 1984, a jury returned a verdict of guilty on the possession with intent to deliver charge only.

Morrow now appeals, raising the following issues: (1) that the trial court erred by denying her motion to suppress evidence because the search warrant for her residence was not supported by probable cause; (2) that the trial court erred in denying her motion to dismiss the indictment because hearsay evidence was presented to the grand jury in the form of a "telex" preliminary lab report; and (3) that AS 11.73.099, the statute defining "imitation controlled substances," is unconstitutional.

## SEARCH WARRANT ISSUES

The standard of review regarding a magistrate's determination of probable cause was enunciated in *Rosa v. State*, 633 P.2d 1027, (Alaska App.1981), where this court said:

In reviewing a magistrate's determination of probable cause this court must

give great deference to the magistrate's decision and must resolve doubtful or marginal cases largely by the preference to be accorded warrants.... "The Fourth Amendment's requirements are practical and not abstract, and affidavits 'must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion....'" The burden of proof on questions pertaining to the sufficiency of the affidavit is on the defendant. [Citations and footnotes omitted.]

*Id.* at 1029–30, *quoting State v. Davenport,* 510 P.2d 78, 82 n. 8 (Alaska 1973). With these standards in mind, the question to be asked is "whether the issuing judge [or magistrate] was provided sufficient evidence to make an independent finding of probable cause" to issue a warrant. *Lockwood v. State,* 591 P.2d 969, 970 (Alaska 1979), *quoting Davis v. State,* 499 P.2d 1025, 1028 (Alaska 1972), *rev'd on other grounds,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

Morrow argues that the affidavit in support of the search warrant was inadequate because there was no indication that M.W. was a credible informant. *See Kralick v. State,* 647 P.2d 1120, 1124–25 (Alaska App. 1982). Morrow argues that the affidavit does not make any allegation that M.W. had given reliable information in the past and the police did not conduct an independent investigation to corroborate her statements. Morrow also contends that this warrant is defective for the same reasons we articulated in *Jones v. State,* 681 P.2d 364 (Alaska App.1984). In *Jones* we held that an affidavit in support of a search warrant by a police detective was not sufficient where the detective relied on a report by a juvenile informant that he witnessed a sale of one-half gram of cocaine at Casey Jones's apartment. The juvenile also stated that he had been to the apartment several times when "he or his companions have purchased cocaine from Jones in the last few months." *Id.* at 365. The juvenile also pointed out an apartment which was confirmed by another police officer to be Jones's apartment. In noting that the hearsay statement of the juvenile informant was not sufficient to support the warrant, we stated:

Moreover, B.V.'s statements that he had observed a friend purchase cocaine and that he had been to Jones's apartment ten to fifteen times when "he or his companions" had purchased cocaine do not qualify as the kind of declarations against penal interest which a court could find inherently credible. It is not a crime to be present when someone else is purchasing cocaine even though that someone else is a friend; nor would vague admissions about past purchases of cocaine support a criminal prosecution in the absence of evidence establishing a *corpus delicti* for a specific purchase. More significantly, the affidavit does not explain the circumstances under which B.V.'s statement was made. If B.V. was being prosecuted by juvenile authorities for drug transactions unrelated to Casey Jones, he would hardly view his statement that he had purchased cocaine in the past from Jones as increasing his exposure to criminal sanctions.

*Id.* at 365.

■ We see the situation in this case as significantly different from that in *Jones.* M.W. had the imitation drugs in her possession and apparently believed that she was confessing to the police that she had been selling amphetamines. There was every reason for the magistrate to credit her story as a declaration against interest. 1 W. LaFave, *Search and Seizure,* § 3.3(c) (1978). We conclude that M.W.'s credibility was adequately supported.

Morrow next argues that the affidavit in support of the warrant did not establish probable cause because it was based on stale information. She argues this is true because M.W.'s alleged transaction with Morrow had occurred seven to nine days prior to the issuance of the warrant.

In *Snyder v. State,* 661 P.2d 638, 647 (Alaska App.1983), this court said:

The question of whether the information contained in the affidavit was "stale"

depends on an evaluation of the circumstances related by the affidavit and the length of time between the issuance of the search warrant and the time of the most recent incriminating activity described in the affidavit.

In evaluating "staleness," this court has chosen to evaluate the following four factors: (1) the type of crime; (2) the nature of the items sought; (3) the extent of the suspect's opportunity for concealment; and (4) normal inferences as to where a criminal would be likely to hide incriminating articles. *Id.* at 648.

■ It appears that the magistrate could have properly concluded the information was not stale because the affidavit evidenced ongoing criminal activity. *See, e.g.,* 1 W. LaFave, *Search and Seizure* § 3.7(a), at 683–87 (1978); *State v. Ogden,* 391 So.2d 434 (La.1980) (probable cause found despite fact that drug sale took place five days prior to the issuance of the warrant where the informant's statements indicated continuous activity and drug transactions, supporting an inference that a continuing supply of cocaine would be available). On the present facts, the affidavit stated that although the actual capsules and tablets were obtained from Morrow seven to nine days previously, money had been turned over to Morrow "within the last few days." Also, Morrow had represented to M.W. that if M.W. "sold out" of the substances, Morrow could readily obtain more. We conclude that the magistrate could properly find that there was probable cause that Morrow was still in possession of the imitation drugs and related material.

■ Next Morrow argues that because M.W. indicated she obtained the pills from Morrow while Morrow was in her car, there was no nexus between Morrow's residence and the items to be searched for.

In *Snyder,* 661 P.2d at 645, we said:

Probable cause to search requires sufficient information to permit the conclusion that criminal activity or evidence of crime will be found at the place to be searched. Put another way, there must

be a "nexus" between the place to be searched, criminal activity, and the items sought. 1 W. LaFave, *Search and Seizure* § 3.7(d), at 704 (1978). *See also State v. Gutman,* 670 P.2d 1166 (Alaska App.1983). We believe that the magistrate could properly conclude from the continuing contacts between M.W. and Morrow that Morrow was engaged in an ongoing business and it is logical to assume that some of the drugs would be stored at her residence. We conclude there was probable cause to search Morrow's residence.

■ Morrow next contends that the police should not have been permitted to seize the telephone list which had on it M.W.'s name and telephone number along with several other names and telephone numbers. Morrow concedes the police could search her purse to find the list, but argues that the incriminating nature of the list was not immediately apparent and therefore the police had no authority to seize it. We disagree. The fact that Morrow had M.W.'s name and telephone number on a list in her purse showed her connection to M.W. and corroborated M.W.'s version of the relationship. It was also probable that the other names and telephone numbers on the list were connected with Morrow's distribution of imitation controlled substances. We conclude the police had authority to seize the list and that the trial judge did not err in refusing to suppress the use of the list as evidence.

## GRAND JURY

■ Morrow argues that the indictment should have been dismissed since the state proved by means of a preliminary laboratory report that the substance which she was charged with possessing contained ephedrine and caffeine. Morrow claims that introduction of this report was inadmissible hearsay for which there was no compelling justification. Alaska R.Crim.P. 6(r). Morrow recognizes that in *McKinnon v. State,* 526 P.2d 18 (Alaska 1974), the supreme court permitted the state to introduce the results of a laboratory report de-

spite the fact that the report was hearsay. Morrow specifically objects to the fact that the report presented to the grand jury was a telex which read: "Preliminary screening indicates presence of ephedrine and caffeine. Final report will be mailed upon completion of analysis." She argues that the situation in her case is more similar to that described by the supreme court in *Metler v. State*, 581 P.2d 669, 673–74 (Alaska 1978), where the court disapproved of introducing at grand jury the hearsay conclusion of handwriting experts. In *Metler* the court concluded that the grand jury was given insufficient information to evaluate the credibility of the experts and their methods. However in Morrow's case, Trooper Engleman, who introduced the report, did give the grand jury background information about the chemist who performed the test. He indicated that the chemist, Suzanne Feller, was a state chemist that he was personally acquainted with and that she had testified as an expert in other drug cases. Trooper Engleman also testified that he field-tested the suspected drugs and found they were not amphetamines. We also note that Suzanne Feller's testimony at trial was apparently essentially the same as her preliminary report, so it appears that we do not have a situation where later tests were inconsistent with the preliminary one. We conclude that under these circumstances the grand jury had sufficient information to evaluate Suzanne Feller's hearsay testimony and that the grand jury could properly find that the substances which Morrow possessed fell within the imitation controlled substances statute.

## VAGUENESS AND OVERBREADTH

Morrow next challenges the statute under which she was convicted as being unconstitutionally overbroad and vague. U.S. Const. amend. XIV and Alaska Const. art. 1 § 7. Morrow was convicted of possession of imitation controlled substances with the intent to deliver in violation of AS 11.73.010(a). That statute provides in part that "a person may not manufacture, deliver, or possess with intent to deliver, an imitation controlled substance." The definition of "imitation controlled substances" is found in AS 11.73.099(3) which provides:

(3) "imitation controlled substance" means a substance containing ephedrine, ephedrine sulfate, pseudoephedrine, pseudoephedrine hydrochloride, phemylpropanolamine, caffeine, theophylline, lidocaine, procaine, tetracaine, dyclonine, acetaminophen, salicylamide, doxylamine, diphenhydramine, pheniramine, chlopheramine, or pryrilamine, or their salts, *that is not a controlled substance, and that by dosage unit appearance* (including color, shape, size, and markings) *or by representations* would lead a reasonable person to believe that the substance is a controlled substance; the term "representations", as used in this paragraph, includes

(A) statements made by an owner or by anyone else in control of the substance concerning the nature of the substance, or its use or effect;

(B) statements made to the recipient that the substance may be resold for inordinate profit;

(C) whether the substance is packaged in a manner normally used for controlled substances;

(D) evasive tactics or actions used by the owner or person in control of the substance to avoid detection by law enforcement authorities;

(E) the storage, packaging, presentation, display of or reference to a controlled substance with, near, or in connection with the activity involving the imitation controlled substance. [Emphasis provided.]

Morrow points out that this statute could reach some conduct which it is unlikely that the statute was intended to cover. Morrow proposes a hypothetical where someone, without any intent to deceive, gives caffeine diet pills, which are available as non-prescription medicine, to someone indicating that the pills are "as effective for weight loss as any prescription medicine." The state recognizes that the stat-

ute could be construed to reach conduct, such as that described by Morrow, which it is unlikely that the legislature intended to prohibit in promulgating the statute. The state urges us to interpret the statutory language defining an "imitation controlled substance" in such a manner that the meaning of the statute will be more clear to avoid any vagueness problems. As AS 11.73.099(3) now reads in part, an "imitation controlled substance" is a substance containing specific chemical components which "by dosage unit appearance ... *or* by representations would lead a reasonable person to believe that the substance is a controlled substance." [Emphasis provided.] The state asks us to read the "or" in AS 11.73.099(3) as "and" in construing the statute. The state argues that as so construed, the statute would not reach innocent behavior.

In *Summers v. Anchorage*, 589 P.2d 863, 866–67 (Alaska 1979), the supreme court set out three factors which must be considered in determining whether a statute is unconstitutionally vague:

First, a statute may not be so imprecisely drawn and overbroad that it "chills" the exercise of first amendment rights. The second consideration is that in order to be consistent with notions of fundamental fairness a statute must give adequate notice of the conduct that is prohibited. The final element in an analysis of statutory vagueness is whether the statute's imprecise language encourages arbitrary enforcement by allowing prosecuting authorities undue discretion to determine the scope of its prohibitions. [Footnotes omitted.]

■ The first question we need to answer is whether the statute is overbroad. The overbreadth doctrine was described in *Marks v. Anchorage*, 500 P.2d 644, 646 (Alaska 1972):

The overbreadth doctrine has evolved to give adequate breathing room to specific first amendment freedoms; a statute violates the doctrine when constitutionally-protected conduct as well as conduct

which the state can legitimately regulate are included within the ambit of the statute's prohibition. [Footnote omitted.]

The statute in question regulates conduct, the possession and sale of certain specific drugs, not speech or association. *See Summers v. Anchorage*, 589 P.2d at 867; *McKenzie v. Anchorage*, 631 P.2d 514, 516–17 (Alaska App.,1981). We therefore conclude that the statute is not overbroad.

■ The next question which we need to answer is whether the statute gives "adequate notice of the conduct that is prohibited." The state has conceded that the statute does have vagueness problems in this area and has asked us to construe the statute. In *Stock v. State*, 526 P.2d 3, 8 (Alaska 1974), the supreme court stated the doctrine which allows a court to construe a statute which is vague on its face in such a way as to avoid constitutional vagueness problems:

A statute in its broad contours may be subject to criticism for failure to give adequate notice as to all types of conduct which are punishable, but, when not involved with the "overbreadth" problem, may still pass muster if: (a) there can be no question as to its applicability to the particular offense involved, and (b) a construction may be placed upon the statute so that in the future the type of offenses coming within its purview may reasonably be understood. [Footnotes omitted.]

In this case the state contends Morrow possessed certain imitation drugs with the intent to deliver those drugs. The state alleges that Morrow knew that the drugs were imitation drugs but intended to deliver them while intentionally misrepresenting that the imitation drugs were controlled drugs. Certainly the conduct which the state alleges is clearly covered by the statute. We believe that the statute can be interpreted by us to apply to those situations involving an intentional misrepresentation that an imitation drug is a controlled drug. As so interpreted we believe that the statute is not vague.[1]

---

1. It appears to us that it may be argued that     certain other conduct falls within the statute.

The third factor which we are to consider is the statute's potential for arbitrary enforcement. The record of this case does not reflect a history of arbitrary or selective enforcement of this statute. *See Summers v. Anchorage*, 589 P.2d at 868. We also do not find that the language of the ordinance is so vague that arbitrary enforcement is likely. *See Brown v. Anchorage*, 584 P.2d 35 (Alaska 1978). We therefore do not invalidate the ordinance for vagueness on this ground. We conclude that the statute, as interpreted, is not unconstitutionally vague.

The state asks us to affirm Morrow's conviction even though the state concedes that the jury instructions which were given in the trial below vary from the interpretation of the imitation controlled drug statute which the state has argued on appeal. The state contends that it is clear that Morrow's defense did not turn on the particular jury instructions which were given in her trial and which might be modified in response to her vagueness claim. *See Stock v. State*, 526 P.2d at 11–12. Morrow did not file a reply brief and therefore has not responded to the state's argument that the statute can be construed so that it is not vague or whether, if the statute is so construed, Morrow's conviction should be affirmed. Furthermore, we have before us only a minimal record to decide this case, which does not include a transcript of the trial. We therefore do not decide whether Morrow has any claim that her conviction was improper because of a claim that might arise out of our post-trial construction of the statute. We remand the case to the trial court to determine whether Morrow's conviction should stand in light of our construction of the statute under which she was convicted.[2]

This case is REMANDED for proceedings not inconsistent with this opinion.

---

An example of conduct which might fall within the statute would be a person who delivers an imitation drug honestly believing that the imitation drug is a controlled substance. However, the case before us does not present this question, and this matter has not been briefed on appeal. We reserve ruling on this issue.

**2.** We retain jurisdiction of this appeal.